

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

AUG 0 4 2015

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

| | |
|---|---|
| SANDRA SCOTT<br><br>     Plaintiff,<br><br>vs.<br><br>C.R. BARD, INC.; and<br>BARD PERIPHERAL VASCULAR, INC.<br><br>     Defendants. | Civil # CV- 4:15CV485-JM<br><br>This case assigned to District Judge Moody<br>and to Magistrate Judge Ray |

---

## COMPLAINT FOR DAMAGES

---

Plaintiff, SANDRA SCOTT, by and through her undersigned attorneys, hereby sues Defendants C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC. (collectively "Bard") and alleges as follows:

### PARTIES

1. Plaintiff, SANDRA SCOTT, at all times relevant to this action is and was a citizen of the state of Arkansas and resides in Fayetteville, Arkansas. On or about May 29, 2012, Plaintiff underwent placement of a Bard Eclipse® IVC Filter at UMAS Medical Center in Little Rock, Arkansas. The Bard Eclipse® IVC Filter subsequently failed to include the following: the filter tilted into the wall of the IVC; the retrieval hook on the filter became embedded into the wall of the IVC; the filler could not be removed despite several attempts at removal; and, due to tilting of the filter it became ineffective and failed to stop blood clots from traveling to the Plaintiffs lungs. The Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, loss of enjoyment of life, disability, scarring and disfigurement and other losses. Plaintiff will require ongoing medical care.

2. Plaintiff was caused to undergo extensive medical care as a result of the

1

failure of the Eclipse® IVC Filter manufactured by the Bard Defendants. Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, loss of enjoyment of life, disability, scarring, disfigurement and other losses.

3. Defendant C.R. Bard, Inc. ("Bard") is a citizen of the state of New Jersey and is authorized to do business in the state of Arkansas and said Defendant was doing business in Little Rock, Arkansas. Bard at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Eclipse Filter System to be implanted in patients such as the Plaintiff throughout the United States, including the state of Arkansas.

4. Defendant Bard Peripheral Vascular, Inc. ("BPV") is a citizen of the state of Arizona and is authorized to do business in the state of Arkansas and said Defendant was doing business in Little Rock, Arkansas. BPV, at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Eclipse Filter System to be implanted in patients such as the Plaintiff throughout the United States, including the state of Arkansas.

5. All references to "Bard" hereafter shall refer to Defendants, Bard and BPV.

### JURISDICTION AND VENUE

6. Plaintiff has suffered damages in an amount that exceeds the jurisdictional minimum of this Court. Furthermore, as alleged in Paragraphs 1, 2, 3 and 4 above, the citizenship of the parties to this action is diverse.

7. Venue is proper in this Court, as the facts and circumstances leading to injuries occurred in Little Rock, Arkansas, and the Eclipse® Filter system that is the subject of this action was sold and purchased and implanted into the Plaintiff's body in Arkansas and the failures of the defective Bard Eclipse® Filter and resulting injuries and damages suffered by Plaintiff occurred in the state of Arkansas. Furthermore, the Bard Defendants were authorized to conduct business in the State of Arkansas and did conduct business in the city of Little Rock, Arkansas. This Court has Diversity Jurisdiction over the parties under 28 U.S.C. 1332 as the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000 excluding interest and costs.

### GENERAL FACTUAL ALLEGATIONS AS TO BARD

8. Plaintiff brings this case for serious personal injuries Plaintiff suffered as

2

result of a surgically implanted medical device, known as an Eclipse® Filter System (hereafter "Eclipse® Filter"), failing and migrating within Plaintiff's body and causing serious and ongoing physical, emotional, and economic damages.

9. The Eclipse® Filter was designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold by the Bard Defendants beginning in approximately January 2010 for the prevention of blood clots (thrombi) from travelling from the lower portions of the body to the heart and lungs.

10. Prior to Plaintiff being implanted with an Eclipse® Filter, the Bard Defendants knew and should have known that the device was defective and unreasonably dangerous for, *inter alia*, the following reasons:

> a. Bard did not have an appropriate and thorough understanding of vena caval dynamics when is designed, manufactured and tested the Eclipse® Filter and when is sold and distributed the Eclipse® Filter for implantation in humans such as the Plaintiff.

> b. Bard failed to conduct appropriate animal studies, bench testing, and human clinical testing to determine how the device would function once implanted in the human body.

> c. Bard knew and/or should have known that the Recovery® filter line, the G2® Filter line and the Eclipse® Filter line contained conditions which the Defendants did not intend that resulted in the device not performing as safely as the ordinary consumer would expect. Further, this family of filters had a high rate of fracture, migration, excessive tilting, perforation of the vena cava wall once implanted in the human body and an inability to percutaneously remove the filter requiring open vascular surgical removal. Bard knew and/or should have known that such failures exposed patients to serious injuries, including: death; hemorrhage; organ injury; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and inability to remove the device. Upon information and belief, Bard also knew or should have known that certain conditions or post-implant procedures, such as morbid obesity or open abdominal procedures, could affect the safety and integrity of the device. Further, Bard knew or should have known that these risks for the Eclipse® Filter were and are substantially higher than other similar devices, to include Bard's own Simon Nitinol® Filter.

> d. Further, Bard knew and/or should have known that the Eclipse® Filter was used to treat conditions of the type which the Plaintiff suffered from.

> e. Despite being aware of these risks as well as their inadequate testing and their lack of a thorough understanding of vena

3

caval dynamics  Bard misrepresented, omitted, and/or failed to provide adequate warnings of these risks  or instructions for safe use.

f. Even when Bard designed and began marketing the Eclipse® Filter, they still failed to issue a recall, issue appropriate warnings and/or notify physicians and consumers that a safer device was available.

## A.     INFERIOR VENA CAVA FILTERS GENERALLY

11. Inferior vena cava ("IVC") filters first came onto the medical market in the 1960's. Over the years, medical device manufacturers have introduced several different designs of IVC filters.

12. An IVC filter is a device that is designed to filter or "catch" blood clots (called "thrombi") that travel from the lower portions of the body to the heart and lungs. IVC filters may be designed to be implanted, either permanently or temporarily, in the human body, more specifically, within the inferior vena cava.

13. The inferior vena cava is a vein that returns blood to the heart from the lower portions of the body. In certain people, for various reasons, thrombi travel from the vessels in the legs and pelvis, through the vena cava and into the lungs. Often times, these thrombi develop in the deep leg veins. These thrombi are called "deep vein thrombosis" or "DVT". Once thrombi reach the lungs, they are considered "pulmonary emboli" or "PE". Pulmonary emboli present significant risks to human health.

14. Certain people are at increased risk for the development of DVT or PE. For instance, an individual who undergoes knee or hip joint replacement surgery is at risk for developing DVT/PE. Obese patients are also at increased risk for DVT/PE. So too are people who have vascular diseases or who have experienced previous strokes. A number of other conditions predispose people to develop DVT/PE, including "coagulopathies" and clotting disorders.

15. Those people at risk for DVT/PE can undergo medical treatment to manage the risk. For example, a doctor may prescribe anticoagulation medications such as Heparin, Warfarin, or Lovenox to regulate the clotting factor of the blood. In some people who are at high risk for DVT/PE, or who are not candidates for anticoagulation medications may require the permanent or temporary implantation of an IVC filter to prevent thromboembolic events.

16. As indicated above, IVC filters have been on the market for decades. The

4

first IVC filters marketed were permanent filters. These devices were designed to be implanted into the IVC permanently. These permanent filters have long-term follow-up data (of up to 20 years and longer) supporting their use and their safety. Beginning in 2003, manufacturers also began marketing what are known as optional or retrievable filters. These filters are designed so that they can be surgically removed from a patient after the risk of PE has subsided. Some of these IVC filter designs were not intended to remain within the human body for indeterminate periods of time but were intended to remain implanted for a finite period of time. The Recovery® Filter and the subsequent family of filters to include the Eclipse® Filter manufactured by Bard, however, are examples of filters that were ultimately marketed as both permanent and retrievable filters.

## THE RECOVERY® FILTER

### i.   FDA Clearance and Intended Use

17. In 2002, Bard and BPV submitted a notification to market the "RECOVERY G2® Filter System" (hereafter "RECOVERY®" or "RECOVERY® Filter") for the prevention of recurrent pulmonary embolism by placement in the inferior vena cava.[1] On November 27, 2002, the RECOVERY® Filter was available for sale and use in the prevention of recurrent pulmonary embolism via *permanent* placement in the vena cava.

18. In April 2003, Bard submitted a notification of intent to market and sell the RECOVERY® Filter for the additional intended use of *optional retrieval* and Bard began to market and sell the RECOVERY® Filter as both a permanent and retrievable filter on or about July 25, 2003.

19. Bard was aware that the RECOVERY® filter was also used extensively off-label, including for purely prophylactic reasons for trauma patients or patients with upcoming surgeries such as bariatric procedures.

### ii.   Design of the Recovery Filter

20. The RECOVERY® Filter is conical in shape and it consists of two (2) levels

---

[1]     Bard and BPV submitted the notification under Section 510(k) of the United States Food, Drug and Cosmetic Act ("Act") of 1976 (21 U.S.C. 321 *et seq*). The 510(k) review process requires any entity engaged in the design, manufacture, distribution or marketing of a device intended for human use to notify the FDA 90 days before it intends to market the device and to establish that the device is substantially equivalent to a legally marketed predicate device. (21 C.F.R. §§ 807.81, 807.92(a)(3)). Substantial equivalence means that the new device has the same intended use and technological characteristics as the predicate device. This approval process allows a manufacturer to bypass the rigorous safety scrutiny required by the pre-market approval process.

of six (6) radially distributed NITINOL® struts that are designed to anchor the filter into the inferior vena cava and to catch any embolizing clots. There are six short struts, which are commonly referred to as the arms, and six long struts, which are commonly referred to as the legs. Each strut is held together by a single connection to a cap located at the top/apex of the device. According to the Patent filed for this device, the short struts are primarily for "centering" or "positioning" within the vena cava, and the long struts with attached hooks are designed to primarily prevent the device from migrating in response to "normal respiratory movement" or "pulmonary embolism."

21.As noted above, the RECOVERY® Filter is constructed with NITINOL®, a metal alloy of nickel and titanium, its name is derived from its composition and its place of discovery (**Ni**ckel **Ti**tanium **Na**val **O**rdnance **L**aboratory). Nitinol® possesses two closely related and unique properties, shape memory and super elasticity. That is, Nitinol® will change shape according to changes in temperature, and then, retake its prior shape after returning to its initial temperature. When placed in saline, therefore, the Nitinol® struts become soft and can be straightened to allow delivery through a small diameter catheter. The metal struts then reassume their original shape when warmed to body temperature in the vena cava.

22.The RECOVERY® filter is inserted percutaneously by a catheter that is guided by a physician through a blood vessel into the inferior vena cava. The RECOVERY® Filter is designed to be retrieved in a similar fashion.

### iii.    Inherent Risks of the RECOVERY® Filter

23.The RECOVERY® Filter is prone to an unreasonably high risk of failure and patient injury following placement in the human body. Multiple studies have reported Bard's RECOVERY® Filter to have a fracture and migration rate ranging from 21% to 31.7%. When such failures occur, shards of the device or the entire device can travel to the heart, where it can cause cardiac tamponade, perforation of the atrial wall, perforation of vessels, myocardial infarction and death. These fractured shards may also become too embedded in tissue or migrate to other organ systems and vasculature, such as the renal veins, heart and lungs, rendering them too dangerous to remove. These patients are exposed to a lifetime of future risk.

24.The RECOVERY® Filter similarly poses a high risk of tilting and penetrating

and perforating the vena cava walls. When such failures occur, the device can perforate nearby organs and vessels such as the aorta, duodenum, small bowel, ureter, which may lead to hemorrhage, retroperitoneal hematomas, small-bowel obstructions, extended periods of severe pain, and/or death. Further, given the risks of injury in attempting to remove devices that have penetrated or perforated the vena cava, the device may not be removable or may require complex and dangerous open vascular surgical removal. These patients in whom the filter cannot be removed are faced with a lifetime of future risk.

25. The RECOVERY® Filter failures described above occur at a substantially higher rate than with other IVC filters including Bard's own Simon Nitinol® Filter.

26. The adverse event reports (AERs) associated with IVC filter devices demonstrates that Bard's IVC Filters are far more prone to device failure than are other similar devices including Bard's own Simon Nitinol® Filter.

27. These failures are attributable, in part, to the fact that the RECOVERY® Filter was designed so as to be unable to withstand the normal anatomical and physiological loading cycles exerted *in vivo*.

28. In addition to design defects, the RECOVERY® Filter suffers from manufacturing defects. These manufacturing defects include, but are not limited to, the absence of electropolishing and the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the device while *in vivo*. In particular, the RECOVERY® Filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device. Put simply, the RECOVERY® Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the aforementioned exterior manufacturing defects makes the device more susceptible to failure.

### iv.    What Bard Knew or Should Have Known

29. Bard was well aware that is lacked a thorough and/or appropriate understanding of vena caval dynamics, Bard did not conduct a clinical study of long-term safety and efficacy, did not perform adequate animal studies and bench testing to determine whether the RECOVERY® Filter would perform safely once implanted in the human body and subjected to normal *in vivo* stresses.

7

30. Soon after the RECOVERY® Filter's introduction to the market in 2003, Bard began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the RECOVERY® Filter was fracturing or migrating post-implantation and that fractured pieces and/or the entire device were migrating throughout the human body, including to other vessels,  the heart and lungs. Bard also received large numbers of AERs reporting that the RECOVERY® Filter was found to have excessively tilted, migrated and/or perforated the inferior vena cava post-implantation and that the filter cannot removed or removal can only be achieved through complex and dangerous open vascular surgery. These failures were often associated with reports of severe patient injuries such as:

    a.  death;

    b.  hemorrhage;

    c.  cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

    d.  cardiac arrhythmia and other symptoms similar to myocardial infarction;

    e.  severe and persistent pain;

    f.  and perforations of tissue, vessels and organs.

31. Bard received AERs reporting that the RECOVERY® Filter had fractured *in vivo* and that the entire device had migrated *in vivo* some of which were reported to have been associated with patient death.

32. From 2003 through September 2005, Bard received increasing numbers of AERs reporting the above described failures and patient injuries.

33. Bard knew that the failure rates associated with the RECOVERY® Filter including death were substantially higher than other similar devices on the market including its own Simon Nitinol® Filter and that the adverse event rates associated with the RECOVERY® Filer compared with other filters was statistically significant.

**v.    Market Withdrawal, but no Recall**

34. In late 2004 or early 2005 Bard, without notifying consumers of the design and manufacturing flaws inherent in the Recovery® Filter and to avoid a recall of the Recovery Filter, began redesigning the Recovery® Filter in an attempt to correct those flaws.  The redesigned filter is known as the G2® Filter, which stands for second generation Recovery® Filter.  Once Bard began marketing and selling the redesigned product in approximately August 2005, Bard quietly withdrew the Recovery® Filter.

Bard failed, however, to make any effort to notify physicians and consumers who were implanted with the Recovery® Filter of the ongoing risks inherent in the use of the Recovery® Filter.

**C.     THE G2® FILTER SYSTEM**

35. On August 10, 2005, Bard stated that the G2® Filter was as safe as or better than the Recovery® Filter and was, therefore substantially equivalent to the Recovery® Filter. Bard stated that the differences between the Recovery® Filter and the G2® Filter were primarily dimensional and no material changes or additional components were added. On August 29, 2005, Bard began selling and marketing the G2® Filter for the same intended uses as the Recovery® Filter, except that it was not sold as a retrievable device.[2]

36. Bard marketed the G2® Filter as having "enhanced fracture resistance," "improved centering," and "increased migration resistance."  Bard again, however, failed to conduct adequate clinical testing for long term safety and efficacy and filed to conduct adequate bench testing and animal studies, to ensure that the device would perform safely and effectively once implanted in the human body and subjected *in vivo* stresses.  Bard still did not have a thorough and/or adequate understanding of vena caval dynamics. Not surprisingly, the G2® Filter's design causes it to be of insufficient integrity and strength to withstand normal *in vivo* body stresses within the human body so as to resist fracturing, migrating, tilting, and/or perforating the inferior vena cava.

37. Also, like its predecessor, in addition to design defects, the G2® Filter suffers from manufacturing defects. These manufacturing defects include, but are not limited to, the absence of electropolishing and the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the G2® Filter while *in vivo*. In particular, the G2® Filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device. Put simply, the G2® Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the aforementioned exterior manufacturing defects makes the device more susceptible to fatigue failure and migration.

---

[2] The G2® Filter was not available for sale/implantation as a retrievable filter until January 15, 2008.

38. Thus, the G2® Filter shares similar defects and health risks as its predicate/predecessor device.

39. As with the Recovery® Filter, Bard immediately began receiving large numbers of AERs reporting that the G2® Filter was, *inter alia*, fracturing, migrating, excessively tilting, and perforating the vena cava once implanted. These failures were again often associated with reports of severe patient injuries such as:

    a.  death;

    b.  hemorrhage;

    c.  cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

    d.  cardiac arrhythmia and other symptoms similar to myocardial infarction;

    e.  severe and persistent pain;

    f.  and perforations of tissue, vessels and organs.

40. Bard represents the fracture rate of the G2® Filter to be 1.2%. Based upon a review of the data available in the public domain (including the Food & Drug Administration (FDA) Manufacturer and User Facility Device Experience (MAUDE) database statistics and the published medical literature), this representation does not accurately reflect the true incidence of device fracture for the G2® Filter.

41. A review of the MAUDE database reveals data to establish that the Bard vena cava filters (including the G2® Filter) are responsible for the majority of all reported adverse events related to inferior vena cava filters.

**D.   THE ECLIPSE FILTER**

42. In January 2010, the Eclipse® filter became commercially available for use in the United States. The Defendants represented that the Eclipse® Filter was substantially similar to the G2® Filter System (predicate device).

43. The Eclipse® Filter system is the third-generation of Bard's retrievable or optional filters.  The Eclipse® is made of the same nickel-titanium alloy, Nitinol®, as the Bard Recovery® and G2® filters.  The design of the Eclipse® Filter System is based entirely off the G2® filter[3], which was also designed, manufactured and sold by the Defendants. The only design difference is the fact that the filter is electropolished prior to the forming of the filter.

---

[3] "G2 filter" – is meant to include the G2 as well as the G2 Express filters manufactured by Bard. The only difference between the G2  and the G2 Express is a hook at the top of the device for a physician to attempt removal.

44. As seen with the Recovery® and G2® filters, soon after its introduction to the market, reports were made that the Eclipse® filter was fracturing, perforating, migrating, tilting and/or could not be removed in the patients it was implanted in. The Eclipse® filter system was still plagued with manufacturing and design defects that were causing damage to the general public that it was implanted in.

45. The failures of the Eclipse® filter were attributable, in part, to the fact that the Eclipse® filter was designed so as to be unable to withstand the normal anatomical and physiological loading cycles exerted *in vivo.*

46. The failures and adverse events associated with (tilt, migrations, fracture, migration and/or inability to remove) the Eclipse® Filter System leads to a number of different, and potentially fatal, complications. These complications include, but are not limited to:

    a. Death;

    b. Hemorrhage;

    c. Cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

    d. Severe and persistent pain;

    e. Tilting of the filter;

    f. Perforation by the filter of tissue, vessels and organs;

    g. Ineffectiveness of the filter to prevent/stop blood clots from traveling to the lung(s); and.

    h. The inability to remove the filter..

47. These failures and/or adverse events associated with the Eclipse® Filter System occur at rates that are unacceptable and at rates that exceed the failure rates associated with competitor filters as well as the Defendant's own Simon Nitinol® Filter.

## E. BARD AND BPV'S KNOWLEDGE OF THE RISK OF FAILURE AND RESULTING DANGERS

48. Upon information and belief, Plaintiff alleges that as early as 2003, Bard was aware and had knowledge or should have had knowledge of the fact that the Recovery® Filter was defective and unreasonably dangerous and was causing injury and death to patients who had received it. Subsequently, Bard was aware as early as 2005 that the G2® Filter System was defective and unreasonably dangerous and was

causing injury and death to patients who had received it.   Similarly, Bard became aware that the Eclipse® Filter System was defective and unreasonably dangerous and was causing injury and death to patients who had received it.

49. Data establishes that the failure rates of the Recovery® Filter, G2® Filter and   Eclipse® Filter are/were exceedingly higher than the rate that Bard has in the past, and currently continues to publish to the medical community and members of the public.   Further, Bard was aware or should have been aware that the Recovery® Filter, G2® Filter and Eclipse® Filter had substantially higher failure rates than did other similar products on the market to include the Simon Nitinol® Filter and the Recovery® Filter, yet Bard failed to warn physicians and consumers of this fact.

50. The conduct of Bard as alleged in this Complaint constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of the Plaintiff. Bard had actual knowledge of the dangers presented by the Recovery Filter®, G2® Filter and Eclipse® Filter, yet consciously failed to act reasonably to:

   a.   Inform or warn Plaintiff, Plaintiff's physicians, or the public at large of these dangers;
   b.   Establish and maintain an adequate quality and post-market surveillance system; and
   c.   Recall the Recovery® Filter, G2® Filter and Eclipse® Filter from the market.

51. Despite having knowledge of the unreasonably dangerous and defective nature of the Eclipse® Filter, Bard consciously disregarded the known risks and continued to actively market and offer for sale the Eclipse® Filter System.

52. Plaintiff further alleges that Bard acted in willful, wanton, gross and total disregard for the health and safety of the users or consumers of their Recovery® Filter, G2® Filter and Eclipse® Filter Systems, acted to serve their own financial interests, and having reason to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

## SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF

53. On or about May 29, 2012, the Plaintiff underwent surgical placement of an Eclipse® Filter.

54. This Eclipse® Filter device was designed, manufactured, prepared,

compounded, assembled, processed, marketed, distributed, and sold by Bard.

55. The Eclipse® Filter subsequently failed to perform as reasonably expected and/or the risks associated with the filter exceeded its benefits/utility. These failures are described in paragraph 1 above. Plaintiff was caused to undergo extensive medical and surgical care and treatment. Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, loss of enjoyment of life, disability, scarring, disfigurement and other losses. Plaintiff will require ongoing medical care.

### FRUADULENT CONCEALMENT

56. Any applicable statutes of limitation have been tolled by the knowing and active concealment and denial of material facts known by Bard when they had a duty to disclose those facts. They have kept Plaintiff and her physicians ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on Plaintiff's part, for the purpose of obtaining delay on Plaintiff's part in filing on her causes of action. Bard's fraudulent concealment did result in such delay.

57. Bard is estopped from relying on the statute of limitations defense because Bard failed to timely disclose, among other things, facts evidencing the defective and unreasonably dangerous nature of the Recovery®, G2® and Eclipse® Filter Systems.

58. Plaintiff and Plaintiff's health care providers could not reasonably have discovered the claims made herein until at the earliest the device was discovered to have malfuncrtioned.

59.    Bard was under a continuing duty to disclose the true character, quality and nature of the device that was implanted in the Plaintiff, but instead they concealed them. Bard's conduct, as described in this Complaint, amounts to conduct purposely committed, which Bard must have realized was dangerous, needlessly reckless, without regard to the consequences or the rights and safety of Plaintiff.

### CORPORATE/VICARIOUS LIABILITY

60. At all times herein mentioned, the Bard Defendants were the agents, servants, partners, co-conspirators and/or joint venturers of each of the other and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

61. There exists and, at all times herein mentioned, there existed a unity of

interest in ownership between the Bard Defendants such that any individuality and separateness between these Bard Defendants has ceased and these Defendants are the alter ego of the other and exerted control over one another. Adherence to the fiction of the separate existence of the Bard Defendants as entities distinct from each other will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

62. At all times herein mentioned, the Bard Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff. As such, each Bard Defendant is individually, as well as jointly and severally, liable to the Plaintiff for Plaintiff's damages.

63. At all times herein mentioned, the officers and/or directors of the Bard Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of the Recovery® Filter, G2® Filter and Eclipse® Filter, and thereby actively participated in the tortious conduct that resulted in the injuries suffered by the Plaintiff.

## COUNT I
### NEGLIGENCE AS TO BARD

64. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1- 63 as though fully set forth herein.

65. At all times relevant to this cause of action, the Bard Defendants were in the business of designing, developing, setting specifications, manufacturing, marketing, selling, and distributing the Recovery®, G2® and Eclipse® Filters.

66. Bard designed, manufactured, marketed, inspected, labeled, promoted, distributed and sold the Eclipse® Filter that was implanted in Plaintiff.

67. Bard had a duty to exercise reasonable and prudent care in the

14

development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the Eclipse® Filter so as to avoid exposing others to foreseeable and unreasonable risks of harm.

68. Bard knew or reasonably should have known that the Eclipse® Filter was dangerous or was likely to be dangerous when used in its intended or reasonably foreseeable manner.

69. At the time of manufacture and sale of the Eclipse Filter, Bard knew or should have known that the Eclipse® Filter:

> a. Was designed and manufactured in such a manner so as to present an unreasonable risk of fracture of portions of the device;
> b. Was designed and manufactured so as to present a unreasonable risk of migration of the device and/or portions of the device; and/or
> c. Was designed and manufactured so as to present a unreasonable risk of the device tilting and/or perforating the vena cava wall and/or could not be removed percutaneously;
> d. Was designed and manufactured to have unreasonable and insufficient strength or structural integrity to withstand normal placement within the human body.

70. At the time of manufacture and sale of the Eclipse® Filter, Bard knew or should have known that using the Eclipse® Filter as intended or in a reasonably foreseeable manner created a significant risk of a patient suffering and severe health side effects including, but not limited to: hemorrhage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; perforations of tissue, vessels and organs; and other severe personal injuries and diseases, which are permanent in nature, including, but not limited to, death, physical pain and mental anguish, scarring and disfigurement, diminished enjoyment of life, continued medical care and treatment due to chronic injuries/illness proximately caused by the device; and the continued risk of requiring additional medical and surgical procedures including general anesthesia, with attendant risk of life threatening complications.

71. Bard knew or reasonably should have known that consumers of the Eclipse® Filter would not realize the danger associated with using the device in its intended use and/or in a reasonably foreseeable manner.

72. Bard breached their to duty to exercise reasonable and prudent care in

15

the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the Eclipse® Filter in, among other ways, the following acts and omissions:

a. Designing and distributing a product in which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

b. Designing and distributing a product in which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the likelihood of potential harm from other device available for the same purpose;

c. Failing to use reasonable care in manufacturing the product and producing a product that differed from their design or specifications or from other typical units from the same production line;

d. Failing to use reasonable care to warn or instruct, including pre and post-sale, Plaintiff, Plaintiff's physicians, or the general health care community about the Recovery® Filter, G2® Filter and Eclipse® Filter's substantially dangerous condition or about facts making the product likely to be dangerous;

e. Failing to perform reasonable pre and post-market testing of the Recovery® Filter, G2® Filter and Eclipse® Filter to determine whether or not the product was safe for its intended use;

f. Failing to provide adequate instructions, guidelines, and safety precautions, including pre and post-sale,  to those persons to whom it was reasonably foreseeable would prescribe, use, and implant the Recovery® Filter, G2® Filter and Eclipse® Filter;

g. Advertising, marketing and recommending the use of the Recovery® Filter, G2® Filter and Eclipse® Filter, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with and inherent in the use of these filter systems;

h. Representing that the Recovery® Filter, G2® Filter and Eclipse® Filter's were safe for their intended use when, in fact, Bard knew and should have known the products were not safe for its intended purpose;

i. Continuing to manufacture and sell the Recovery® Filter, G2® Filter and Eclipse® Filter with the knowledge that said products were dangerous and not reasonably safe, and failing to comply with good manufacturing regulations;

j. Failing to use reasonable and prudent care in the design, research, manufacture, and development of the Recovery® Filter, G2® Filter and Eclipse® Filter so as to avoid the risk of serious harm associated with the use of these filter systems;

k. Advertising, marketing, promoting and selling Recovery® Filter, G2® Filter and Eclipse® for uses other than as approved and indicated in the product's label;

l.  Failing to establish an adequate quality assurance program used in the manufacturing of the Recovery® Filter, G2® Filter and Eclipse® Filter.

m.  Failing to establish and maintain and adequate post-market surveillance program;

n.  Failing to remove the Eclipse® Filter from the market; and,

o.  A reasonable manufacturer, distributor, or seller under the same or similar circumstances would not have engaged in the before-mentioned acts and omissions.

73. As a direct and proximate result of the foregoing negligent acts and omissions by the Bard Defendants, Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, mental anguish, loss of enjoyment of life, disability, scarring and disfigurement, loss of earnings and other losses proximately caused by the device. Plaintiff will have continued risk of requiring additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the Eclipse® Filter to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

## COUNT II

### NEGLIGENT FAILURE TO WARN AS TO BARD

74.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1- 73 as though fully set forth herein.

75. Bard designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Eclipse® Filter, including the one implanted into Plaintiff, into the stream of commerce and in the course of same directly advertised and marketed the device to consumers or persons responsible for consumers.

76. At the time Bard designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, Bard knew or should have known the device presented an unreasonable danger to users of the product when put to its intended and reasonably anticipated use. Specifically, Bard knew or should have known at the time they manufactured, labeled, distributed and sold the Eclipse® Filter, which was implanted in Plaintiff, that the Eclipse® Filter, *inter alia*, posed a significant and higher risk than other similar devices of device failure including Bard's own Simon Nitinol® Filter and the Recovery Filter (fracture, migration, tilting, perforation of the vena cava wall and an inability to remove the filter percutaneously) and resulting serious injuries. Upon

17

information and belief, Bard also knew or should have known that certain conditions or post-implant procedures, such as morbid obesity or open abdominal procedures, could affect the safety and integrity of the device.

77. Therefore, Bard had a duty to warn about the particular risks of the Eclipse® Filter and to provide adequate instructions on the safe and proper use of the device. Bard further had a duty to warn of dangers and proper safety instructions that it became aware of even after the device was distributed and implanted in the Plaintiff. The Defendant's knew or should have known that the Eclipse® Filter was dangerous or was likely to be dangerous when used in its intended or reasonably foreseeable manner.

78. Despite this duty, Bard failed to adequately warn of material facts egarding the safety and efficacy of the Eclipse® Filter, and further failed to adequately provide instructions on the safe and proper use of the device.

79. No health care provider, including Plaintiff's, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers and/or ultimate users of the device.

80. The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

81. Plaintiff and Plaintiff's health care providers used the device in a normal, customary, intended, and foreseeable manner, namely as a surgically implanted device used to prevent pulmonary embolisms.

82. The Eclipse® Filter implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marked and labeled, promoted, distributed and sold by Bar.

83. Therefore, the Eclipse® Filter implanted in Plaintiff was defective and unreasonably dangerous at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

84. As a direct and proximate result of the foregoing negligent acts and omissions by the Bard Defendants, Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, mental anguish, loss of enjoyment of life, disability, scarring, disfigurement, loss of earnings and other losses proximately caused by the device. Plaintiff will have continued risk of requiring

18

additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the Eclipse® Filter to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

**COUNT III**

**STRICT LIABILITY FAILURE TO WARN**

85. Plaintiff adopts, re-alleges and incorporates by referenced each and every allegation contained in paragraphs 1 – 73 as though fully set forth herein.

86. Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Eclipse® Filter, including the one implanted into Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers.

87. At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, Defendants knew or should have known the device presented an unreasonable danger to users of the product when put to its intended and reasonably anticipated use. Specifically, Defendants knew or should have known at the time they manufactured, labeled, distributed and sold the Eclipse® Filter, which was implanted in Plaintiff, that the Eclipse® Filter, *inter alia*, posed a significant and higher risk than other similar devices of device failure (fracture, migration, tilting, perforation of the vena cava wall and the inability to remove the filter percutaneously) and resulting serious injuries. Upon information and belief, Defendants also knew or should have known that certain conditions or post-implant procedures, such as morbid obesity or open abdominal procedures, could affect the safety and integrity of the device.

88. Therefore, Defendants had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device. Defendants further had a duty to warn of dangers and proper safety instructions that it became aware of even after the device was distributed and implanted in Plaintiff.

89. Despite this duty, Defendants failed to adequately warn of material facts regarding the safety and efficacy of RECOVERY® Filter, the G2® Filter, and the Eclipse® Filter, and further failed to adequately provide instructions on the safe and proper use of the device. Furthermore, the foreseeable risks of harm from the Eclipse®

19

Filter could have been reduced or avoided by providing reasonable instructions and/or warnings and the failure to provide those instructions or warnings makes the Eclipse® Filter unreasonably dangerous and renders the device defective.

90. No health care provider, including Plaintiff's, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers and/or ultimate users of the device.

91. The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

92. Plaintiff and Plaintiff's health care providers used the device in a normal, customary, intended, and foreseeable manner, namely as a surgically implanted device used to prevent pulmonary embolisms.

93. The Eclipse® Filter implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

94. Therefore, the Eclipse® Filter implanted in Plaintiff was defective and reasonably dangerous at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

95. As a direct and proximate result of Defendants' lack of sufficient warning and/or instructions, Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, mental anguish, loss of enjoyment of life, disability, scarring and disfigurement, loss of earnings and other losses proximately caused by the device. Plaintiff will have continued risk of requiring additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the Eclipse® Filter to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

## COUNT IV

### STRICT LIABILITY DESIGN DEFECT AS TO BARD

96. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-73 as though fully set forth herein.

97. At all times relevant to this action, Bard developed, tested, designed, manufactured, inspected, labeled, promoted, distributed and sold into the stream of commerce the Eclipse® Filter, including the one implanted in Plaintiff.

98. The Eclipse® Filter was expected to, and did, reach its intended consumers without substantial change in the condition in which it was in when it left Bard's possession.  In the alternative, any changes that were made to the Eclipse® Filter implanted in Plaintiff were reasonably foreseeable to Bard.

99. The Eclipse® Filter implanted in the Plaintiff was in a condition unreasonably dangerous and was expected to, and did, reach its intended consumers without substantial change in the condition in which it was in when it left the Defendant's possession. In the alternative, any changes that were made to the filter were reasonably foreseeable to the Defendant's.

100.    The Eclipse® Filter implanted in the Plaintiff was defective in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the Defendants and/or the risk of danger in the design outweighed the benefits of the filter.

101.    Plaintiff and Plaintiff's health care providers used the Eclipse® Filter in a manner that was reasonably foreseeable to Bard.

102.    Neither Plaintiff, nor Plaintiff's health care providers could have by the exercise of reasonable care discovered the devices defective condition or perceived its unreasonable dangers prior to Plaintiff's implantation with the device.

103.    As a direct and proximate result of the Eclipse® Filter's defective design,  Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, mental anguish, loss of enjoyment of life, disability, scarring, disfigurement, loss of earnings and other losses proximately caused by the device.  Plaintiff will have continued risk of requiring additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the Eclipse® Filter to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

## COUNT V

## STRICT LIABILITY MANUFACTURING DEFECT AS TO BARD

104.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1- 73 as though fully set forth herein.

105.    Bard designed, set specifications, manufactured, prepared,

compounded, assembled, processed, marketed, labeled, distributed, and sold the Eclipse® Filter that was implanted into Plaintiff. The Eclipse® Filter was unreasonably dangerous because of a manufacturing defect in that it was different from its intended design and failed to perform as safely as the intended design would have performed.

106.    The Eclipse® Filter implanted in Plaintiff was in a condition unreasonably dangerous and the filter was expected to and did reach the Plaintiff and/or her physicians without substantial change affecting the filter.

107.    Plaintiff and Plaintiff's health care providers used the device in a manner that was reasonably foreseeable to Bard.

108.    As a result of this condition, the product injured Plaintiff and failed to perform as safely as an ordinary consumer would expect when used in a reasonably foreseeable manner.

109.    As a direct and proximate result of the Eclipse® Filter's manufacturing defect, Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, mental anguish, loss of enjoyment of life, disability, scarring, disfigurement, loss of earnings and other losses proximately caused by the device. Plaintiff will have continued risk of requiring additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the Eclipse® Filter to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

**COUNT VI**

**BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY**

110.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1- 73 as though fully set forth herein.

111.    At all times relevant to this action, Bard designed, researched, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce the Recovery®, G2®, and Eclipse® Filter for use as a surgically implanted device used to prevent pulmonary embolisms and for uses other than as approved and indicated in the product's instructions, warnings, and labels.

112.    At the time and place of the sale, distribution, and supply of the Eclipse® Filter System to Plaintiff by way of Plaintiff's health care providers and medical facilities, Bard, through sales representatives, consultants, printed materials

and other advertising and marketing efforts expressly represented and warranted that the Eclipse® Filter System was safe and effective for its intended and reasonably foreseeable use.

113.     The Eclipse® Filter System did not conform to the express representations made by Defendants through sales representatives, consultants, printed materials, and other advertising and marketing efforts. The Plaintiff and her physicians relied on these express representations in the purchase, use and implantation of the Eclipse® Filter in the Plaintiff.

100.  Bard knew of the intended and reasonably foreseeable use of the Eclipse® Filter, at the time they marketed, sold, and distributed the product for use by Plaintiff, and warranted the product to be of merchantable quality, and safe and fit for its intended use.

114.     Bard represented and warranted to the healthcare community, Plaintiff and Plaintiff's health care providers, that the Eclipse® Filter was safe and of merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

115.     The representations and warranties made by Bard were false, misleading, and inaccurate because the Eclipse® Filter was defective, unsafe, unreasonably dangerous, and not of merchantable quality, when used in its intended and/or reasonably foreseeable manner. Specifically, at the time of Plaintiff's purchase of the Eclipse® Filter from Bard regarding centering of the filter, fracture, migration, excessive tilting, and perforation of the inferior vena cava;

      a.    It was designed in such a manner so as to result in a statistically significant incidence of injury to the organs and anatomy; and

      b.    It was manufactured in such a manner so that the exterior surface of the Eclipse® Filter System was inadequately, improperly and inappropriately prepared and/or finished causing the device to weaken and fail.

116.     Plaintiff and Plaintiff's health care providers reasonably relied on the superior skill and judgment of Bard as the designers, researchers and manufacturers of the product, as to whether Eclipse® Filter was of merchantable quality and safe and fit for its intended use, and also relied on the warranty of merchantability and fitness for the particular use and purpose for which the Recovery®, G2®, and Eclipse® Filter was manufactured and sold.

117.     Bard placed the Recovery®, G2®, and Eclipse® Filter into the stream of

23

commerce in a defective unsafe, and unreasonably dangerous condition, and the product was expected to and did reach Plaintiff without substantial change in the condition in which the Eclipse® Filter was manufactured and sold.

118.     Bard breached their warranty because their Recovery®, G2®, and Eclipse® Filter was not fit for its intended use and purpose.

119.     As a proximate result of the Bard Defendants breach of their warranties, Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, mental anguish, loss of enjoyment of life, disability, scarring, disfigurement, loss of earnings and other losses proximately caused by the device. Plaintiff will have continued risk of requiring additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the Eclipse® Filter to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

## COUNT VII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

120.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-73 as though fully set forth herein.

121.     At all times relevant to this action, Defendants designed, researched, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce the Recovery®, G2®, and Eclipse® Filters for use as a surgically implanted device used to prevent pulmonary embolisms and for uses other than as approved and indicated in the product's instructions, warnings, and labels.

122.     At the time and place of the sale, distribution, and supply of the Defendants' Eclipse® Filter System to Plaintiff by way of Plaintiff's health care providers and medical facilities, Defendants expressly represented and warranted, by labeling materials submitted with the product, that the Eclipse® Filter System was safe and effective for its intended and reasonably foreseeable use.

123.     Defendants knew of the intended and reasonably foreseeable use of the Eclipse® Filter, at the time they marketed, sold, and distributed the product for use by Plaintiff, and impliedly warranted the product to be of merchantable quality, and safe and fit for its intended use.

124.     Defendants impliedly represented and warranted to the healthcare

24

community, Plaintiff and Plaintiff's health care providers, that the Eclipse® Filter was safe and of merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

125.    The representations and implied warranties made by Defendants were false, misleading, and inaccurate because the Eclipse® Filter was defective, unsafe, unreasonably dangerous, and not of merchantable quality, when used in its intended and/or reasonably foreseeable manner. Specifically, at the time of Plaintiff's purchase of the Eclipse® Filter from the Defendants, through Plaintiff's physicians and medical facilities, it was not in a merchantable condition in that:

  a.    It was designed in such a manner so as to be prone to a statistically high incidence of failure, including fracture, migration, excessive tilting, and perforation of the inferior vena cava;
  b.    It was designed in such a manner so as to result in a statistically significant incidence of injury to the organs and anatomy; and
  c.    It was manufactured in such a manner so that the exterior surface of the Eclipse Filter System was inadequately, improperly and inappropriately prepared and/or finished causing the device to weaken and fail.

126.    Plaintiff and Plaintiff's health care providers reasonably relied on the superior skill and judgment of Defendants as the designers, researchers and manufacturers of the product, as to whether Eclipse® Filter was of merchantable quality and safe and fit for its intended use, and also relied on the implied warranty of merchantability and fitness for the particular use and purpose for which the Recovery® , G2® and the Eclipse® Filters were manufactured and sold.

127.    Defendants placed the Recovery®, G2® and the Eclipse® Filters into the stream of commerce in a defective, unsafe, and unreasonably dangerous condition, and the product was expected to and did reach Plaintiff without substantial change in the condition in which the Eclipse® Filter was manufactured and sold.

128.    Defendants breached their implied warranty because the Recovery®, G2® and Eclipse® Filters are not fit for their intended use(s) and/or the use(s) reasonably foreseeably by the Defendant.

129.    As a proximate result of Defendants breach of their implied warranties, Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, mental anguish, loss of enjoyment of life, disability, scarring, disfigurement, loss of earnings and other losses proximately caused by the device. Plaintiff will have continued risk of requiring additional medical and surgical

procedures, including risk of life threatening complications and ongoing medical care to monitor the Eclipse® Filter to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

**COUNT VIII**

**BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**

130. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1- 73 as though fully set forth herein.

131. At all times relevant to this action, Defendants designed, researched, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce the Recovery®, G2®, and Eclipse® Filters for use as a surgically implanted device used to prevent pulmonary embolisms and for uses other than as approved and indicated in the product's instructions, warnings, and labels.

132. At the time and place of the sale, distribution, and supply of the Defendants' Eclipse® Filter to Plaintiff by way of Plaintiff's health care providers and medical facilities, Defendants expressly represented and warranted, by labeling materials submitted with the product, that the Eclipse® Filter System was safe and effective for its intended and reasonably foreseeable use.

133. Defendants knew of the intended and reasonably foreseeable use of the Eclipse® Filter, at the time they marketed, sold, and distributed the product for use by Plaintiff, and impliedly warranted the product to be of merchantable quality, and safe and fit for its intended use.

134. Defendants knowingly represented and warranted to the healthcare community, Plaintiff and Plaintiff's health care providers, that the Eclipse® Filter was safe and of merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

135. The representations and warranties made by Defendants were false, misleading, and inaccurate because the Eclipse® Filter was defective, unsafe, unreasonably dangerous, and not of merchantable quality, when used in its intended and/or reasonably foreseeable manner. Specifically, at the time of Plaintiff's purchase of the Eclipse® Filter from the Defendants, through Plaintiff's physicians and medical facilities, it was not in a merchantable condition in that:

      a.    It was designed in such a manner so as to be prone to a statistically high incidence of failure, including fracture,

26

> migration, excessive tilting, and perforation of the inferior vena cava;
>
> b.   It was designed in such a manner so as to result in a statistically significant incidence of injury to the organs and anatomy; and
>
> c.   It was manufactured in such a manner so that the exterior surface of the Eclipse® Filter System was inadequately, improperly and inappropriately prepared and/or finished causing the device to weaken and fail.

136.   Plaintiff and Plaintiff's health care providers reasonably relied on the superior skill and judgment of Defendants as the designers, researchers and manufacturers of the product, as to whether the Eclipse® Filter was of merchantable quality and safe and fit for its intended use, and also relied on the implied warranty of merchantability and fitness for the particular use and purpose for which the Recovery® , G2® and the Eclipse® Filters were manufactured and sold.

137.   Defendants placed the Recovery®, G2® and Eclipse® Filters into the stream of commerce in a defective, unsafe, and unreasonably dangerous condition, and the product was expected to and did reach Plaintiff without substantial change in the condition in which the Eclipse® Filter was manufactured and sold.

138.   Defendants breached their warranty of fitness for a particular purpose because the Recovery®, G2® and Eclipse® Filters are not fit for the specific purpose for which the Defendant's knowingly sold the filters and for which, in reliance on the judgment of the Defendant's, Plaintiff and/or her physicians bought and implanted the filter.

139.   As a proximate result of Defendants breach of their implied warranties, Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, mental anguish, loss of enjoyment of life, disability, scarring, disfigurement, loss of earnings, and other losses proximately caused by the device. Plaintiff will have continued risk of requiring additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the Eclipse® Filter to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

## COUNT IX

## FRAUDULENT CONCEALMENT

140.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-73 as though fully set forth herein.

141.     At all times relevant to this cause, and as detailed *supra*, Defendants fraudulently concealed material information concerning the Eclipse® Filter from Plaintiff, Plaintiff's health care providers, and the general medical community relating to the safety of the Recovery®, G2® and Eclipse® Filters, the efficacy of Recovery®, G2® and Eclipse® Filter and the rate of failure of the Recovery®, G2® and Eclipse® Filter;

142.     Any applicable statutes of limitation have been tolled by the knowing and active concealment and denial of material facts known by Defendants when they had a duty to disclose those facts.  They have kept Plaintiff ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on Plaintiff's part, for the purpose of obtaining delay on Plaintiff's part in filing on their causes of action. Defendants' fraudulent concealment did result in such delay

143.     Defendants are estopped from relying on the statute of limitations defense because Defendants failed to timely disclose, among other things, facts evidencing the defective and unreasonably dangerous nature of the Recovery®, G2®, and Eclipse® Filter Systems.

144.     Plaintiff and Plaintiff's health care providers could not reasonably have discovered the claims made herein until at the earliest the device was discovered to have malfunctioned.

145.     The Defendants are and were under a continuing duty to disclose the true character, quality and nature of the device that was implanted in Plaintiff, but instead they concealed them.  Defendants' conduct, as described in this complaint, amounts to conduct purposely committed, which Defendants must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of Plaintiff.

146.     As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, mental anguish, loss of enjoyment of life, disability, scarring, disfigurement, loss of earnings and other losses proximately caused by the device. Plaintiff will have continued risk of requiring additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the Eclipse® Filter to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

## COUNT X

## NEGLIGENT MISREPRESENTATION AS TO BARD

147.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1- 73 as though fully set forth herein.

148.     At all times relevant to this cause, and as detailed *supra*, Bard negligently provided Plaintiff, Plaintiff's health care providers, and the general medical community with false or incorrect information, or omitted or failed to disclose material information concerning the Eclipse® Filter that the Defendant's knew or should have known was false and misleading,  defendants made these false and misleading statements intending that the statements would be relied on by Plaintiff, her health care providers and the general medical community and the Plaintiff and her physicians justifiably relied on the Defendant's false and misleading statements to include, but not limited to, misrepresentations relating to the following subject areas:

      a.  The safety of the Eclipse® Filter;

      b.  The efficacy of the Eclipse® Filter;

      c.  The rate of failure of the Eclipse® Filter; and

      d.  The approved uses of the Eclipse® Filter.

149.     The false and misleading information information distributed by Bard to the public, the medical community and Plaintiff's health care providers was in the form of reports, press releases, advertising campaigns, labeling materials, print advertisements, commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Eclipse® Filter. Bard made the foregoing misrepresentations knowing that they were false or without reasonable basis.  These materials included instructions for use and warning document that was included in the package of the Eclipse® Filter that was implanted in Plaintiff.

150.     The foregoing representations and omissions by Bard were in fact false. The Eclipse® Filter is not safe, fit, and effective for human use in its intended and reasonably foreseeable manner. The use of the Eclipse® Filter is hazardous to the user's health, and said device has a serious propensity to cause users to suffer serious injuries, including without limitation, the injuries Plaintiff suffered. Further, the device has a significantly higher rate of failure and injury than do other comparable devices.

151.     In reliance upon the false and negligent misrepresentations and

omissions made by Bard, Plaintiff and Plaintiff's health care providers were induced to, and did use the Eclipse® Filter, thereby causing Plaintiff to sustain severe and permanent personal injuries.

152.     Bard knew and had reason to know that Plaintiff, Plaintiff's health care providers, and the general medical community did not have the ability to determine the true facts intentionally and/or negligently concealed and misrepresented by Bard, and would not have prescribed and implanted same, if the true facts regarding the device had not been concealed and misrepresented by Defendants.

153.     Bard had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects in the form of dangerous injuries and damages to persons who are implanted with the Eclipse® Filter.

154.     At the time Bard failed to disclose and misrepresented the foregoing facts, and at the time Plaintiff used the Eclipse® Filter, Plaintiff and Plaintiff's health care providers were unaware of said Defendants' negligent misrepresentations and omissions.

155.     Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff's health care providers; to gain the confidence of the public and the medical community, including Plaintiff's health care providers; to falsely assure them of the quality of the Recovery®, G2® and Eclipse® Filters and its fitness for use; and to induce the public and the medical community, including Plaintiff's healthcare providers to request, recommend, prescribe, implant, purchase, and continue to use the Recovery®, G2® and Eclipse® Filters.

156.     The foregoing representations and omissions by Defendants were, in fact, false. The Recovery®, G2® and Eclipse® Filters are not safe, fit, and effective for human use in its intended and reasonably foreseeable manner. The use of the Recovery®, G2® and Eclipse® Filters are hazardous to the user's health, and said device has a serious propensity to cause users to suffer serious injuries, including without limitation, the injuries Plaintiff suffered. Further, the device has a significantly higher rate of failure and injury than do other comparable devices.

157.     Plaintiff, Plaintiff's health care providers and general medical community

reasonably relied upon misrepresentations and omissions made by Bard where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Eclipse® Filter.

158.    Plaintiff and Plaintiff's health care provider's reliance on the foregoing misrepresentations and omissions by Bard was the direct and proximate cause of Plaintiff's injuries as described herein.

159.    As a direct and proximate result of the Bard Defendants negligent misrepresentations, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, scarring, disfigurement, disability, loss of earnings, medical expenses, and other losses, in an amount to be determined at trial.

## COUNT XI
### FRAUDULENT MISREPRESENTATION

160.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1- 73 as though fully set forth herein.

161.    At all times relevant to this cause, and as detailed *supra,* Defendants intentionally made false statements of material fact to the Plaintiff, Plaintiff's health care providers, and the general medical community or intentionally omitted or intentionally failed to disclose material information concerning the Eclipse® Filter that Defendant's knew the statements were in fact false and misleading or made the statements knowing they did not know whether the statements were true or false, Defendants' made these false and misleading statements intending that the statements would be relied on by the Plaintiff, Plaintiff's health care providers and the general medical community and Plaintiff and her health care providers relied upon the Defendant's false and misleading statements. The Defendant's false and misleading statements concerned the following material facts and subjects:

        a. The safety of the Recovery®, G2® and Eclipse® Filters;

        b. The efficacy of the Recovery®, G2® and Eclipse® Filters;

        c. The rates of failure of the Recovery®, G2® and Eclipse® Filters; and

        d. The approved uses of the Recovery®, G2® and Eclipse® Filters.

162.    The false and misleading information distributed by Defendants to the public, the medical community and Plaintiff's health care providers was in the form of reports, press releases, advertising campaigns, labeling materials, print

advertisements, commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Recovery®, G2® and Eclipse® Filters. Defendants made the foregoing misrepresentations knowing that they were false or without reasonable basis. These materials included instructions for use and warning document that was included in the package of the Eclipse® Filter that was implanted in Plaintiff.

163.    Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff's health care providers; to gain the confidence of the public and the medical community, including Plaintiff's health care providers; to falsely assure them of the quality of the Recovery®, G2® and Eclipse® Filters and its fitness for use; and to induce the public and the medical community, including Plaintiff's healthcare providers to request, recommend, prescribe, implant, purchase, and continue to use the Recovery®, G2® and Eclipse® Filters.

164.    The foregoing representations and omissions by Defendants were in fact false. The Recovery®, G2® and Eclipse® Filters are not safe, fit, and effective for human use in its intended and reasonably foreseeable manner. The use of the Recovery®, G2® and Eclipse® Filters are hazardous to the user's health, and said device has a serious propensity to cause users to suffer serious injuries, including without limitation, the injuries Plaintiff suffered. Further, the device has a significantly higher rate of failure and injury than do other comparable devices.

165.    In reliance upon the false and negligent misrepresentations and omissions made by Defendants, Plaintiff and Plaintiff's health care providers were induced to, and did use the Eclipse® Filter, thereby causing Plaintiff to sustain severe and permanent personal injuries.

166.    Defendants knew and had reason to know that Plaintiff, Plaintiff's health care providers, and the general medical community did not have the ability to determine the true facts intentionally and/or negligently concealed and misrepresented by Defendants, and would not have prescribed and implanted same, if the true facts regarding the device had not been concealed and misrepresented by Defendants.

167.    Defendants had sole access to material facts concerning the defective

nature of the product and its propensity to cause serious and dangerous side effects in the form of dangerous injuries and damages to persons who are implanted with the Recovery®, G2® and Eclipse® Filters.

168.    At the time Defendants failed to disclose and misrepresented the foregoing facts, and at the time Plaintiff used the Eclipse® Filter, Plaintiff and Plaintiff's health care providers were unaware of said Defendants' negligent misrepresentations and omissions.

169.    Plaintiff, Plaintiff's health care providers and general medical community reasonably relied upon misrepresentations and omissions made by Defendants where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Recovery®, G2® and Eclipse® Filters.

170.    Plaintiff and Plaintiff's health care provider's reliance on the foregoing misrepresentations and omissions by Defendants' was the direct and proximate cause of Plaintiff's injuries as described herein.

171.    As a direct and proximate result of the Bard Defendants' fraudulent misrepresentations, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, scarring, disfigurement, disability, loss of earnings, medical expenses, and other losses, in an amount to be determined at trial.

## **PUNITIVE DAMAGES**

172.    Plaintiff re-alleges each and every allegation in this Complaint and incorporates each allegation into this Count, as if set forth at length, in its entirety.

173.    Plaintiff is entitled to an award of punitive and exemplary damages based upon Bard's intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and their complete and total reckless disregard for the public safety and welfare.

174.    Bard had knowledge of, and were in possession of evidencedemonstrating that, the Eclipse® Filter was defective and unreasonably dangerous and had a substantially higher failure rate than did other similar devices on the market. Yet, Bard failed to:

      a. Inform or warn Plaintiff or her health care providers of the dangers;

      b. To establish and maintain an adequate quality and post-market surveillance system; and

33

c.  Recall the Eclipse® Filter from the market

175.     Bard acted to serve their own interests and having reasons to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, and consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

176.     As a direct, proximate, and legal result of Bard's acts and omissions a described herein, and Plaintiff implantation with Bard's defective product, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, disability, scarring, disfigurement, and other losses, in an amount to be determined at trial.

**PRAYER FOR DAMAGES AS TO THE BARD DEFENDANT'S**

**WHEREFORE**, Plaintiff, SANDRA SCOTT, prays for relief on the entire complaint, as follows:

177.  Judgment to be entered against all Bard Defendants on all causes of action of this Complaint and damages suffered;

178.  Plaintiff be awarded full, fair, and complete recovery for all claims and causes of action and damages suffered relevant to this action;

179.  Plaintiff be awarded all appropriate costs, fees, expenses, and pre-judgment and post judgment interest, as authorized by law on the judgments entered on Plaintiff's behalf; and,

180.  Such other relief and damages the court deems just and proper.

**WHEREFORE**, Plaintiff, SANDRA SCOTT, prays for relief as to the Bard Defendants, as follows:

**AS TO THE FIRST CAUSE OF ACTION FOR NEGLIGENCE AGAINST DEFENDANTS C.R. BARD, AND BPV.**

181.   General damages according to proof at the time of trial;

182.   Medical and other special damages, past, present, and future, according to proof at the time of trial;

183.   Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

184.   Costs of suit incurred herein;

185.   Punitive damages; and

186.   Such other and further relief as the court may deem just and proper.

## AS TO THE SECOND CAUSE OF ACTION FOR  NEGLIGENT FAILURE TO WARN AGAINST DEFENDANTS C.R. BARD, AND BPV.

187.   General damages according to proof at the time of trial;

188.   Medical and other special damages, past, present, and future, according to proof at the time of trial;

189.   Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

190.   Costs of suit incurred herein;

191.   Punitive damages; and

192.   Such other and further relief as the court may deem just and proper.

## AS TO THE THIRD CAUSE OF ACTION FOR STRICT LIABILITY FAILURE TO WARN AGAINST DEFENDANTS C.R. BARD AND BPV.

193.   General damages according to proof at the time of trial;

194.   Medical and other special damages, past, present, and future, according to proof at the time of trial;

195.   Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

196.   Costs of suit incurred herein;

197.   Punitive damages; and

198.   Such other and further relief as the court may deem just and proper.

## AS TO THE FOURTH CAUSE OF ACTION FOR STRICT LIABILITY DESIGN DEFECT AGAINST DEFENDANTS C.R. BARD, AND BPV.

199.   General damages according to proof at the time of trial;

200.   Medical and other special damages, past, present, and future, according to proof at the time of trial;

201.   Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

202.   Costs of suit incurred herein;

203.   Punitive damages; and

204.   Such other and further relief as the court may deem just and proper.

## AS TO THE FIFTH CAUSE OF ACTION FOR  STRICT LIABILITY MANUFACTURING

**DEFECT AGAINST DEFENDANTS C.R. BARD, AND BPV.**

205. General damages according to proof at the time of trial;

206. Medical and other special damages, past, present, and future, according to proof at the time of trial;

207. Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

208. Costs of suit incurred herein; and

209. Such other and further relief as the court may deem just and proper.

**AS TO THE SIXTH CAUSE OF ACTION FOR BREACH OF EXPRESS WARRANTY AGAINST DEFENDANTS C.R. BARD, AND BPV.**

210. General damages according to proof at the time of trial;

211. Medical and other special damages, past, present, and future, according to proof at the time of trial;

212. Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

213. Costs of suit incurred herein; and

214. Such other and further relief as the court may deem just and proper.

**AS TO THE SEVENTH CAUSE OF ACTION FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AGAINST DEFENDANTS C.R. BARD, AND BPV.**

215. General damages according to proof at the time of trial;

216. Medical and other special damages, past, present, and future, according to proof at the time of trial;

217. Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

218. Costs of suit incurred herein; and

219. Such other and further relief as the court may deem just and proper.

**AS TO THE EIGHTH CAUSE OF ACTION FOR BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE AGAINST DEFENDANTS C.R. BARD, AND BPV.**

220. General damages according to proof at the time of trial;

221. Medical and other special damages, past, present, and future, according to proof at the time of trial;

222. Pre-judgment and post-judgment interest pursuant to the laws of the

State of Arkansas;

223. Costs of suit incurred herein; and

224. Such other and further relief as the court may deem just and proper.

**AS TO THE NINTH CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT AGAINST DEFENDANTS C.R. BARD, AND BPV.**

225. General damages according to proof at the time of trial;

226. Medical and other special damages, past, present, and future, according to proof at the time of trial;

227. Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

228. Costs of suit incurred herein; and

229. Such other and further relief as the court may deem just and proper.

**AS TO THE TENTH CAUSE OF ACTION FOR NEGLEGENT MISREPRESENTATION AGAINST DEFENDANTS C.R. BARD, AND BPV.**

230. General damages according to proof at the time of trial;

231. Medical and other special damages, past, present, and future, according to proof at the time of trial;

232. Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

233. Costs of suit incurred herein; and

234. Such other and further relief as the court may deem just and proper.

**AS TO THE ELEVENTHTH CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION AGAINST DEFENDANTS C.R. BARD, AND BPV.**

235. General damages according to proof at the time of trial;

236. Medical and other special damages, past, present, and future, according to proof at the time of trial;

237. Pre-judgment and post-judgment interest pursuant to the laws of the State of Arkansas;

238. Costs of suit incurred herein; and

239. Such other and further relief as the court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues.

Dated this the 4th day of August, 2015

Respectfully Submitted,

Tab Turner
#85158
**TURNER & ASSOCIATES, P.A.**
4705 Somers Avenue
North Little Rock, AR 72116
501-791-2277 – Phone
501-791-1251 – Fax
tab@tturner.com

and

Joseph R. Johnson (PHV Pending)
Florida Bar #372250
**BABBITT & JOHNSON, P.A.**
Suite 100
1641 Worthington Road
West Palm Beach, FL  33409
561-684-2500 – Phone
561-684-6308 – Fax
jjohnson@babbitt-johnson.com

COUNSEL FOR PLAINTIFFS